IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| FERLADIS HEROD, ) | |
| ) | |
| Movant, ) | CASE NO. 3:09-0267 |
| ) | JUDGE HAYNES |
| v. ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Respondent. ) | |

## MEMORANDUM

Movant, Ferladis Herod, filed this action under 28 U.S.C. § 2255, seeking to set aside his convictions for conspiracy to possess with the intent to distribute five (5) kilograms or more of cocaine and possession of more than five (5) kilograms of cocaine with the intent to distribute. Based upon his two prior drug convictions, Movant received a life sentence. After a review of the motion, the Court ordered the United States to file a response that was filed (Docket Entry No.12) to which Movant filed a reply (Docket Entry No.19). The Court also appointed the Federal Public Defender to represent Movant, but an amended motion was not filed.

Here, Movant's specific claims are: (1) that newly discovered evidence establishes Movant's actual innocence of these offenses; (2) that his trial counsel provided ineffective assistance for her failures to discover exculpatory evidence, to investigate and cross-examine a key government witness, to request a venue instruction, to challenge the Government's conspiracy charge, and to challenge his sentence enhancement; (3) that the Government suppressed favorable treatment of a cooperating co-defendant and that this co-defendant committed crimes while on pretrial release; (4) the Controlled Substance Act is unconstitutional;

(5) the Sixth Circuit's decision on direct appeal is erroneous; and (6) Movant's life sentence is unconstitutional.

## A. Procedural History

The Fourth Superseding Indictment charged Movant and others with one count of conspiracy to possess with intent to distribute five (5) kilograms or more of cocaine and a second count of possession of five (5) kilograms or more of cocaine with intent to distribute. (United States v. Herod, 3:02cr-00128, Docket Entry No. 318; Fourth Superseding Indictment). On January 31, 2005, a jury found Movant guilty of both counts. Id.; Docket Entry Nos. 431, 432. On July 14, 2005, the Court imposed a life sentence. Id.; Docket Entry No. 516, Judgment. Movant filed a notice of appeal. Id.; Docket Entry No. 512, Notice of Appeal. On July 5, 2007, the Sixth Circuit affirmed Petitioner's conviction and sentence. United States v.Moore, 240 Fed. Appx. 699 (6th Cir. 2007).

## B. Findings of Fact

The facts underlying the Movant's convictions were summarized by the Sixth Circuit on Movant's direct appeal as follows:

> The evidence presented to the jury showed the following. Javier Zamora ran a marijuana and cocaine distribution network centered in Chicago. Zamora employed Phillip Pena-Santiago to transport the drugs from sources in downtown Chicago to Zamora's residence, which he used as a storage facility. And he employed Efren Lopez-Benitez to courier drugs from Zamora's residence to buyers in Michigan, including Jose Fernando Moran Ocegueda.
>
> In April 2002, Zamora gave Lopez-Benitez eight to ten pounds of marijuana and told him to contact Ocegueda because "he could move it." JA 1350-51. Lopez-Benitez contacted Ocegueda and sold him the marijuana. Lopez-Benitez arranged another sale of drugs—this time half a kilogram of cocaine—to Ocegueda from Zamora a while later.

2

In the early summer of 2002, Ocegueda approached Lopez-Benitez about buying five to seven kilograms of cocaine, which he planned to cut and sell for $26,000 a kilogram. They met at Zamora's house, and Zamora agreed to provide Ocegueda with the cocaine but Ocegueda "would have to wait." JA 1359. While discussing the delivery of the cocaine with Lopez-Benitez and Guillermo Alvarez-Garcia (another colleague) at a restaurant in Kalamazoo, Michigan, Ocegueda offered the use of a 1998 Plymouth Breeze. The Plymouth Breeze was useful for transporting drugs, Ocegueda explained, because it had a hidden compartment where the passenger-side airbag used to be.

In July, Zamora arranged to buy the cocaine from a supplier in Memphis, Tennessee. After Lopez-Benitez refused to retrieve Ocegueda's cocaine from Memphis, Zamora contacted Pena-Santiago, and he agreed to make the trip. On July 9, Lopez-Benitez picked up the Plymouth Breeze from Ocegueda, met with Pena-Santiago and taught him how to open the car's hidden compartment. Lopez-Benitez also gave Pena-Santiago a hand-drawn map showing him where to go in Memphis and the phone number of Paulino Guizar—Zamora's brother-in-law and Pena-Santiago's contact in Memphis. **That night, after arriving in Memphis, Pena-Santiago called Guizar, arranged to meet him and rented a hotel room.**

**The two met the next day and scheduled a meeting with "the person holding the cocaine"—Ferlandis Herod. JA 770. Herod, who drove a red pick-up truck (a "red Ford Ranger truck," JA 1786), met the two at a gas station and directed them to follow him to a nearby cemetery. There, the three transferred the cocaine from the bed of Herod's pick-up to the trunk of the Plymouth Breeze, and Herod left.**

**All of this made Guizar upset because they now had "[t]oo many kilos of cocaine." JA 774. He made a series of phone calls, which prompted another meeting with Herod, this time outside Pena-Santiago's hotel. Herod offered to "take [back] as many [kilograms] as [they] were going to give him," JA 775, but left empty-handed because Guizar could not decide how much to return. Later that night, Guizar and Pena-Santiago met with Herod again at a gas station and followed him to his residence on Cleopatra Drive. They parked the Plymouth Breeze in Herod's garage, unloaded a portion of the cocaine and went into Herod's house for "a couple of minutes" to talk. JA 778-79. Escorted by Herod on a blue Yamaha motorcycle, Pena-Santiago and Guizar returned to the hotel for the night.**

The next day, July 11, Pena-Santiago and Guizar met two of Guizar's colleagues and purchased a vacuum-sealing, food-storage system from Sam's Club. After several phone calls, they met with Terrance Moore, who led them to a house on West Holmes Avenue. Eric Griffin, one of Moore's friends, owned the house and

3

had agreed to let Moore use it to unload and store "some dope." JA 791, 1159. That night, Pena-Santiago and Guizar retrieved the cocaine they had left at Herod's house and put it in Griffin's garage. As payment for the use of Griffin's garage, Moore and Griffin received two to three kilograms of cocaine. At the same time, Moore gave a pistol to one of Guizar's colleagues, who handed it to Guizar, who handed it to Pena-Santiago, who in turn left the gun in the garage.

When everyone but Guizar and Pena-Santiago had left the garage, these two inventoried the remaining cocaine and determined that there was between 70 and 80 kilograms. Guizar and Pena-Santiago repackaged the cocaine using the vacuum-sealing system from Sam's Club, placed 12 to 15 kilograms in the gas tank of Guizar's truck and 7 kilograms in the hidden compartment of the Plymouth Breeze. At that point, Guizar told Pena-Santiago to deliver the seven kilograms in the Plymouth Breeze to Nashville before restocking and returning to Chicago. Pena-Santiago also spoke with Zamora, who promised him "a truck plus a bunch of money" for completing the additional delivery. JA 811.

The next morning, July 12, Pena-Santiago left for Nashville in the Plymouth Breeze. About 50 miles outside of Nashville, an officer stopped Pena-Santiago for speeding and Pena-Santiago consented to a search of the car. During the search, Pena-Santiago called Zamora and told him that he had been pulled over for speeding but that the cocaine remained safely hidden. When the police discovered the cocaine hidden in the Breeze's compartment, they arrested Pena-Santiago, and soon after he agreed to cooperate.

At the urging of the police, Pena-Santiago placed several recorded telephone calls to Zamora, Lopez-Benitez and Guizar. Pena-Santiago told them he had been stopped for speeding and received a speeding ticket. He said the police had not found the hidden compartment (and the cocaine) but that they had impounded the Plymouth Breeze after finding marijuana in the trunk. Pena-Santiago also told Zamora that the police would release the vehicle only to its registered owner and that he needed money for a hotel room.

Zamora contacted Lopez-Benitez and told him to go to Nashville to pick up the Plymouth Breeze from the impound lot. Ocegueda also ordered Alvarez-Garcia and another person to go with Lopez-Benitez and called to check on their progress during the drive. Upon their arrival in Nashville, they went to Pena-Santiago's hotel to pick him up, but they were arrested instead.

Meanwhile, Moore called Griffin and told him to pick up Guizar, who was still staying at Griffin's house on West Holmes Avenue, and bring him to Moore's residence in Mississippi. Because Griffin "didn't know if police were coming or not," he did not have much time to check and see if all the drugs had been removed from his garage, but when Moore asked if Griffin and Guizar "[got]

4

> everything out of the house," Griffin said they had. JA 1174. That evening the police searched Griffin's property and found empty kilogram wrappers in the trash can, a hotel receipt for "Phillip Pena," JA 1305, an instructional video for using a vacuum-sealing system and an old bill addressed to "Terrance Moore," JA 1313.

Id. at 702-04 (emphasis added). The Sixth Circuit's other factual findings are set forth in the context of Movant's specific claims.

### C. Conclusions of Law

For relief under 28 U.S.C. § 2255, a movant must establish an error of constitutional magnitude which "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). The record must establish a fundamental defect or a complete miscarriage of justice to warrant relief. Reed v. Farley, 512 U.S. 339, 348 (1994). A § 2255 motion cannot challenge the claims presented on direct appeal absent exceptional circumstances or an intervening change in the law. Davis v. United States, 417 U.S. 333, 342 (1974); DuPont v. United States, 76 F.3d 108, 110 (6th Cir. 1996) ("'A § 2255 motion may not be used to relitigate an issue that was raised on appeal absent highly exceptional circumstances.'") (quoting United States v. Brown, 62 F.3d 1418 (6th Cir. 1995)). "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'" Bousley v. United States, 523 U.S. 614, 622 (1998) (citations omitted).

A court is not required to conduct an evidentiary hearing in an action under Section 2255, where the record establishes the lack of merit of the claims. Arredondo v. United States, 178 F.3d 778, 782 (6th Cir. 1999). Based upon the nature of Movant's claims, his criminal action and direct appeal, the Court concludes that an evidentiary hearing is unnecessary.

5

## 1. Newly Discovered Evidence Claim

As to his newly discovery evidence claim, Movant submits the affidavit of Lermedeyo Malone, Movant's blood cousin and a government witness at Movant's trial. In his affidavit, Malone asserts that he, not Movant, engaged in the conduct that the co-defendant Pena-Santiago described at trial. (Docket Entry No.2-2). Yet, in another interview by a Government agent, Malone denied the statements in his earlier affidavit. (See Docket Entry No. 12-1, Mundy Affidavit).

Albeit in a difference context, in Livingston v. United States, No. 98-4464, 2000 WL 1477227 (6th Cir. Sept. 25, 2000), the Sixth Circuit set forth the requirements for newly discovered evidence:

> 1) the new evidence was discovered after trial; 2) the evidence could not have been discovered earlier with due diligence; 3) the evidence is material and not merely cumulative or impeaching; and 4) the evidence would likely produce an acquittal. See United States v. Turns, 198 F.3d 584, 586-87 (6th Cir.2000).

\* \* \*

> The key to deciding whether evidence is "newly discovered" or only "newly available" is to ascertain **when the defendant found out about the information at issue**. See Turns, 198 F.3d at 587-88. A witness's shifting desire to testify truthfully does not make that witness's testimony "newly discovered" evidence. See id.; see also United States v. Lockett, 919 F.2d 585, 591 (9th Cir.1990) (when a defendant who has chosen not to testify comes forward to offer testimony exculpating a co-defendant, the evidence is not "newly discovered"); United States v. Jacobs, 475 F.2d 270, 286 n. 33 (2d Cir.1973) (a court must exercise great caution in considering evidence to be "newly discovered" when it existed all along and was unavailable only because a co-defendant, since convicted, had availed himself of his privilege not to testify).

2000 WL 1477227, at *2 (emphasis added).

Here, Malone was a witness at Movant's trial who testified as a Government witness that he loaned his telephone to Movant. Of the factors to be considered under

6

Livingston, the Court concludes that with his contradictory statements to Mundy, Malone's shifting testimony is not newly available testimony. If Malone's testimony had been presented at trial, the Government would have cross examined him and Malone would deny his exculpatory statements, as in this proceeding. Moreover with the Sixth Circuit's findings that Pena-Santiago met with Movant three times and that his identification of Movant was adequate to support the jury verdict, the Court concludes that in all likelihood, Malone's statement would not have resulted in an acquittal. This claim lacks merit.

## 2. Ineffective Assistance of Counsel Claim

Movant's ineffective assistance of counsel claims are that his trial counsel failed to discover exculpatory evidence, to investigate and cross-examine a key government witness, to request a venue instruction, to challenge the Government's conspiracy charge, and to challenge his sentence enhancement.

To establish ineffective assistance of counsel, a movant must show: (1) that his counsel's performance fell below an objective standard of reasonableness and (2) that a "reasonable probability" exists that the performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687-94 (1984). In reviewing counsel's performance, the Court must "indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." Id. at 689. Prejudice is a "reasonable probability that, but for counsel's unprofessional errors, the result of proceeding would have been different." Id. at 694. "A determination of the prejudice prong of the

7

Strickland analysis is necessarily dependent on a review of the merits of [Movant's] . . . claim." Cross v. United States, 893 F.2d 1287, 1290 (11th Cir. 1990).

Whether an attorney's performance was reasonably effective requires consideration of the totality of the circumstances of the trial. Strickland, 466 U.S. at 688. "Judicial scrutiny of counsel's performance must be highly deferential," id. at 689, and a strong presumption "arises" that "counsel's conduct falls within the wide range of reasonable professional assistance," id., particularly on tactical or strategic decisions. Id. at 690. Trial counsel's failures must be "'outside the wide range of professionally competent assistance.'" Smith v. United States, 348 F.3d 545, 551 (6th Cir. 2003) (quoting Strickland, 466 U.S. at 690).

Movant's burden is to "show a reasonable probability that, but for his attorney's errors, the proceedings would have produced a different result." Ross v. United States, 339 F.3d 483, 492 (6th Cir. 2003). In this showing, "[i]t will generally be appropriate for a reviewing court to assess counsel's overall performance throughout the case in order to determine whether the 'identified acts or omissions' overcome the presumption that a counsel rendered reasonable professional assistance." Kimmelman v. Morrison, 477 U.S. 365, 386 (1986) (quoting Strickland, 466 U.S. at 690).

As to defense counsel's failure to discover Malone's testimony, for the reasons stated on the merits of Movant's newly discovered evidence claim, the Court fails to discern how Movant can establish any prejudice from Movant's trial counsel's alleged omission of Malone's statements.

8

Movant's next claim concerns his trial counsel's omissions to challenge or cross-examination effectively co-defendant Pena-Santiago, a Government witness. This subject was addressed in Movant's direct appeal and the Sixth Circuit found as follows:

> After his arrest, Pena-Santiago spent several weeks helping DEA agent Billy Joe Mundy to identify locations and witnesses and to sort through the scope and extent of the conspiracy. Although Pena-Santiago could not identify Herod by name, he explained to Agent Mundy that Herod lived in a "new house with [a] brick garage," JA 982, and that there should be a "red Ford Ranger truck" parked out front, JA 1786. On July 16, just four days after his arrest, Pena-Santiago and Agent Mundy drove to Memphis to identify the house where the excess cocaine was first stored. Upon turning onto Cleopatra Drive, Pena-Santiago identified Herod's "red Ford Ranger, ... extended cab truck" immediately, JA 1786-87, and identified the house next to it as Herod's. Agent Mundy noted the address and took down the truck's license plate number. When asked, Pena-Santiago could not give Agent Mundy details about the inside of *706 Herod's garage, though he remembered that "it had a motorcycle in it." JA 983.
>
> **During the investigation, Agent Mundy asked Pena-Santiago to identify photographs several times, always using the same procedure: Agent Mundy took out a photograph and placed it "in a folder face down on the table"; Agent Mundy told Pena-Santiago that, if he recognized the person in the picture, he should explain "where [he] recognize[d] [the person] from, [and] any name [he] may know [the person] by"; Agent Mundy then turned over the photograph and let Pena-Santiago talk. JA 1847. Using this procedure, Pena-Santiago identified a photograph of Zamora on July 17, and photographs of Zamora, Lopez-Benitez, Guizar and another conspirator on July 22. But Pena-Santiago was not able to identify every photograph—including several pictures of Zamora's relatives. On July 31, Agent Mundy showed Pena-Santiago at least two photographs using this procedure: one was a black-and-white copy of Herod's driver's license photograph, see JA 155, which Agent Mundy had obtained by using the license plate number on Herod's truck; the other was of Griffin. Pena-Santiago identified both photographs, though he could only describe Herod as the man who lived on Cleopatra Drive because he admitted that he never learned Herod's name. On May 6, 2003, after Herod was arrested and photographed, Agent Mundy asked Pena-Santiago to identify this new photograph, see JA 159, which he did immediately. Pena-Santiago also identified Herod at trial.**

\* \* \*

9

"Although identifications arising from single-photograph displays may be viewed in general with suspicion," Manson v. Brathwaite, 432 U.S. 98, 116, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), Pena–Santiago's pretrial identification of Herod was not unduly suggestive. *First*, the context of a multi-member conspiracy spanning at least four States and dozens of individuals undercuts the possibility that the identification procedure was unnecessarily suggestive. Unlike the typical identification situation in which an eyewitness is asked to identify a single person, Pena–Santiago had dozens of individuals to choose from in identifying the photographs given to him.

*Second*, **Herod forgets that Pena–Santiago repeated this procedure many times, making the procedure, to some extent, the functional equivalent of a large photograph array**. And Herod does not argue that Agent Mundy engaged in suggestive tactics in conjunction with the procedure: No one argues that Agent Mundy suggested that the driver's license photograph depicted Herod nor that Agent Mundy and Pena–Santiago were talking about Herod shortly before the identification occurred. He instead asks us to hold that every identification through a "single photo display" is unduly suggestive as a matter of law, Br. at 38, which we decline to do.

*Third*, **Pena–Santiago's extensive contacts with Herod greatly diminish any risk of misidentification.** Pena–Santiago had many opportunities to observe Herod: first at a Memphis gas station, next at a cemetery to transfer the cocaine, next outside Pena–Santiago's hotel when Herod first offered to take back some of the cocaine, next at a different gas station from which Herod escorted Pena–Santiago to his house on Cleopatra Drive, then at Herod's house where they unloaded the cocaine and talked inside for "a couple of minutes," JA 778–79, and finally when Pena–Santiago retrieved the cocaine from Herod's garage the next night. Pena–Santiago not only saw Herod several times, the two also spent considerable time working with each other—transferring the cocaine from Herod's truck to the Plymouth Breeze, unloading the cocaine in Herod's garage and reloading the cocaine into the Breeze—not to mention the time they spent chatting inside Herod's house the first night. The district court did not abuse its discretion in admitting the identification.

* * *

**Defense counsel attempted to impeach Pena–Santiago's testimony by repeatedly stressing to the jury that Pena–Santiago expected to benefit from his cooperation,** see JA 973, 1056, **that the DEA paid Pena–Santiago's expenses in return for his assistance,** see JA 964, 1019–20, 1050, that Pena–Santiago had a "lot of drug history" as both a courier and a user, JA 950, and that Pena–Santiago had received substantial mental health counseling, see JA 1007. **Defense counsel also wove the disclosed information into their cross-**

> examination, asking Pena-Santiago about his work with law enforcement in conducting controlled buys, about his blackouts, and about his admissions to his mental health counselor. Given that defense counsel cross-examined Pena-Santiago on these very issues and given that Moore has not shown how he would have cross-examined Pena-Santiago differently had he received the materials earlier, he has not shown prejudice.
>
> * * *
>
> **Co-conspirators Alvarez-Garcia, Griffin and Lopez-Benitez corroborated Pena-Santiago's story; the government had already shown that Pena-Santiago identified first Herod's house and then Herod's photograph without prompting; and the jury already knew that Agent Mundy credited Pena-Santiago's testimony (he was after all the government's chief witness).**

240 Fed Appx. at 705, 706, 707, 708 (emphasis added).

Given defense counsel's cross-examination of Pena-Santiago, the Court cannot discern any prejudice to Movant on this claim. This claim lacks merit.

As to trial counsel's failure to challenge the lack of the Government's proof of a single conspiracy involving at least five (5) kilograms of cocaine from Memphis to Michigan, Pena-Santiago, a government witness, described Movant's role in this conspiracy as well as the roles of the other co-defendants. (Docket Entry No. 546, Trial Transcript at 75-250). Movant's trial counsel sought to discredit Pena-Santiago's testimony, (Docket Entry No. 547, Trial Transcript at 225-250 and Docket Entry No. 548, Trial Transcript at 7-33), by painting Pena-Santiago as a liar who could not be trusted. (Docket Entry No. 547, Trial Transcript at 230-235). Movant's counsel raised this issue in Movant's direct appeal. Thus, the Court concludes that this claim for ineffective assistance of counsel lacks merit.

As to Movant's alleged lack of ties to the telephone records involved in the conspiracy, on Movant's direct appeal, the Sixth Circuit found:

> Guizar, Herod, Moore and Ocegueda all claim that the government unduly
> prejudiced their defenses by offering improper testimony analyzing the telephone
> records in the case and that the district court's limiting instructions did not cure
> the problem. The government introduced 19 different phone records, including
> bills and printouts of raw calling data, to corroborate the testimony of
> Pena-Santiago, Alvarez-Garcia, Griffin and Lopez-Benitez that the defendants
> communicated frequently throughout the conspiracy via telephone.
>
> * * *
>
> [T]he district court limited the telephone records to corroborating the particular
> phone calls attested to by government witnesses, and **the government showed
> that the conspirators had access to the phones and that the records
> corroborated each witness's testimony.**

Id. at 708, 709 (emphasis added).

Movant's trial counsel cross-examined co-conspirator Eric Griffin extensively about the telephone number and cited DEA agent's analysis of the telephone records. As noted, the Court ruled some of this testimony to be unreliable and instructed the jury to strike any of their notes of on this testimony. The Sixth Circuit affirmed that ruling. "A Federal prisoner may not relitigate in a § 2255 motion to vacate sentence claims that were raised and considered on direct appeal." Dupont, 76 F.3d at 111 (quoting Kelly v. United States, 977 F.2d 581 (6th Cir. 1992)). Again, the Court cannot discern any prejudice to Movant on this claim.

As to defense counsel's failure to request a jury instruction on venue, Movant argues that his conduct occurred in Memphis that is in the Western District of Tennessee. Yet, Pena-Santiago was arrested in the Middle District with cocaine that Movant provided. This claim lacks merit.

As to Movant's counsel's failure to object to the two-level enhancement for possessing a firearm in connection with a drug offense, the sentencing transcript reveals Movant's counsel's objected to this enhancement, contending that the weapon was not used to further the conspiracy,

12

but the weapon remained in Movant's residence with the cocaine. (United States v. Herod, 3:02cr 128, Docket entry No. 565 at 12-18). The Sixth Circuit also addressed the merits of this issue on direct appeal. Moore, 240 Fed. Appx. at 711-13.

### 4. The Brady Claim

This claim is based upon information about Pena-Santiago, a cooperating witness and co-defendant whom Movant asserts received favorable treatment from the Government and committed crimes and used drugs while on pretrial release. The Sixth Circuit made findings on these issues about Pena-Santiago's cooperation:

> **Before trial, the government disclosed that the DEA gave Pena-Santiago regular payments for his help in the pending case and that Pena-Santiago was receiving mental health counseling. At trial, the government also disclosed that several local sheriff's departments paid Pena-Santiago to assist in drug busts. Also at trial, Pena-Santiago admitted that he suffered from occasional blackouts "a long time" ago, JA 1014, prompting Moore and his co-defendants to seek Pena-Santiago's mental health records.**
>
> Before we will overturn this verdict, Moore must show that the information withheld was both material and exculpatory—that "there is a reasonable probability that, had the evidence been disclosed to the defense [earlier], the result of the proceeding would have been different." Pennsylvania v. Ritchie, 480 U.S. 39, 57, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) (internal quotation marks omitted). Moore cannot meet this burden. Moore has not shown that the government failed to disclose any information about Pena-Santiago's medical history—the government after all disclosed before trial that Pena-Santiago was engaged in mental health counseling and the specific records requested by Moore were not in the hands of the government but in the hands of a private mental health facility. Nor has he shown how any delay by the government in producing these materials prejudiced his defense.

240 Fed. Appx. at 707.

Based upon these findings, the Court concludes that Movant has not presented any facts that differ in any significant way from the proof at his trial. Engaging in drug buys is a form of

13

criminal activity that was considered on Movant's direct appeal. The Sixth Circuit's findings and conclusions render this claim without merit.

### 2. Movant's Remaining Claims

Movant's claim that the Controlled Substances Act is unconstitutional is without merit. Gonzalez v. Raich, 545 U.S. 1 (2005) (upholding constitutionality of this Act as permissible under the Commerce Clause). Given the Sixth Circuit's affirmance of Movant's sentence on direct appeal, Movant's unconstitutional sentencing claim lacks merit. Finally, as a matter of law, Movant cannot challenge the Sixth Circuit's decision on his direct appeal in this action.

For these reasons, Movant's motion to vacate his sentence under 28 U.S.C. § 2255 should be denied.

An appropriate Order is filed herewith.

**Entered** on this the 17th day of November, 2011.

WILLIAM J. HAYNES, JR.
United States District Judge